IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
Case No. 5:19-cv-00124-KDB-DSC

| | |
|---|---|
| REGGIE REDMON,<br><br>Plaintiff,<br><br>v.<br><br>FLEXSOL PACKAGING CORPORATION,<br><br>Defendant. | VERIFIED AMENDED COMPLAINT |

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), and within 21 days of Defendant filing its (1) Motion to Strike Exhibit A from Plaintiff's Complaint, [ECF No. 4], and (2) Partial Motion to Dismiss Plaintiff's Complaint, [ECF No. 6], Plaintiff Reggie Redmon, by and through undersigned counsel, files this Verified Amended Complaint. Seeking damages and demanding a jury trial, Plaintiff alleges the following:

## PARTIES

1. Plaintiff Reggie Redmon ("Redmon"), an African-American man and a lifelong Baptist, is a citizen and resident of Iredell County, North Carolina.

2. Defendant FlexSol Packaging Corporation ("FlexSol") is a manufacturer of plastics and other packaging materials for various retail companies. Headquartered in Pompano Beach, Florida, FlexSol operates out of several facilities across the country, including one located at 3610 Taylorsville Highway, Statesville, North Carolina 28625, where the events alleged herein occurred.

## JURISDICTION

3. Redmon brings this civil action pursuant to 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and the common law of the State of North Carolina.

4. Redmon has met all jurisdictional requirements and exhausted all administrative remedies before bringing this action. On or about March 13, 2018, Redmon filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), No. 430-2018-01496. The EEOC issued Redmon a Notice of Right to Sue on June 27, 2019. Redmon initiated this action within ninety days of that Notice of Right to Sue.[1]

5. This Court has original jurisdiction over Redmon's Title VII and §§ 1981 and 1983 claims, under 28 U.S.C. § 1331, and has supplemental jurisdiction over Redmon's state wrongful discharge claims, under 28 U.S.C. § 1367, because they arise from the same case or controversy.

6. Venue is proper in the Western District of North Carolina, under 28 U.S.C. § 1391, as FlexSol's facility in Statesville, North Carolina is physically located and doing business within in this District, and all events alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

7. At all times relevant, Redmon has been (and continues to be) a devoted Baptist.

8. Based upon his religious briefs, Redmon has (and continues to) observe Sundays and/or the Sabbath as holy, and therefore, abstains from participating in any secular work on Sundays.

9. On or about December 12, 2012, FlexSol hired Redmon as a Repel Operator in its Statesville, North Carolina facility.

---

[1] Plaintiff filed his initial Complaint on September 24, 2019. [ECF No. 1].

10. At the start of his employment, Redmon informed his Plant Manager, Jim Redman (Caucasian), and his then-direct supervisor, Mike Martin (Caucasian), that he could not work on Sundays because of his religious beliefs and his related, unpaid service as an Associate Minister at a nearby Baptist church. (Following in the footsteps of his father, a longtime volunteer Minister of Music at a Baptist church, Redmon has also played (and continues to play) the piano and drums at his church, as well as teach Sunday school.)

11. Both Plant Manager Redman and Martin accommodated to Redmon's sincerely held religious practices and did not schedule Redmon to work on Sundays. (Several of Redmon's co-workers who wanted overtime hours, agreed to work on Sundays.)

12. For the remainder of 2012, and until on or about June 2016, Redmon maintained a good working relationship with his co-workers, Plant Manager Redman, and Martin. Redmon also did not receive any disciplinary actions and was recognized within the Statesville facility for his positive work performance.

13. On or about June 2016, during a lunch break at work, Redmon watched one of his co-workers, a FlexSol maintenance employee named David Hensley (Caucasian), tie some rope together to make a noose.

14. As Hensley put the noose together, Redmon approached Hensley and explained to him the deep-rooted, racist history surrounding nooses, how Hensley's conduct offended him, and how other African-American employees would be negatively impacted if they saw Hensley's noose.

15. Hensley dismissed Redmon's comments, and responded that what he was doing was not a problem, and that "slavery happened a long time ago."

3

16. That same day, uncomfortable with Hensley's conduct and nonchalant reaction to his concerns, Redmon reported the incident to an administrative supervisor, David Johnson (Caucasian), and one of the Plant's Leadmen, Nick Hartsell (Caucasian).

17. During his conversation with Johnson and Hartsell, Redmon reiterated the deep-rooted, racist history surrounding nooses, how Hensley's conduct offended him, and how Hensley's conduct would offend other African-American employees.

18. Both Johnson and Hartsell, however, tried to diffuse Redmon's concerns. They told Redmon that Hensley was "stupid," that Hensley simply "did not know any better," and that it would be best for Redmon and any other African-American employees to just ignore Hensley.

19. But upon information and belief, understanding the severity of Hensley's conduct, Johnson and Hartsell shared Redmon's concerns with Plant Manager Redman and one of FlexSol's Human Resources representatives.

20. Yet despite Redmon's complaint about Hensley's making of a noose, FlexSol did not take any corrective action against Hensley.

21. After FlexSol failed to discipline Hensley for making a noose, Redmon witnessed Hensley make another noose at work.

22. Over time, Redmon also heard Hensley make several racist comments, including one statement in which Hensley associated African Americans with monkeys.

23. Uncomfortable with each incident he witnessed, Redmon complained to Johnson, explaining quite candidly how offensive Hensley's conduct was towards Redmon and other African-American employees.

24. But each time Redmon spoke with Johnson about Hensley's conduct, Johnson continued to tell Redmon that Hensley simply "did not know any better," and that it would be best for Redmon and other African-American employees to ignore Hensley.

25. Upon information and belief, however, Johnson continued to share Redmon's concerns about Hensley's conduct with one of FlexSol's Human Resources representatives and Plant Manager Redman.

26. Despite Redmon's numerous complaints about Hensley's racist actions, FlexSol still did not take any corrective action against Hensley.

27. Because FlexSol failed to discipline Hensley, Redmon continued to witness Hensley engage in racist behavior at work, including Hensley placing white sheets over his head that had two holes cut out around Hensley's eyes—resembling a hood worn by some members of the Ku Klux Klan.

28. In fact, on or about March 2017, while speaking with one of FlexSol's maintenance workers, a Latino employee known as "Chico," Redmon shared his concerns about Hensley's conduct, including Hensley's placement of white sheets over his head, resembling a Ku Klux Klan hood.

29. After Redmon shared his concerns, "Chico" then detailed some of his interactions with Hensley, including Hensley's frequent use of racial slurs towards him, such as "wetback"—a derogatory term that has been used decades to reference undocumented immigrants.

30. And to confirm Redmon's concerns about Hensley, "Chico" pulled out his cell phone and explained to Redmon that he also was in possession of a recent picture of Hensley wearing a white sheet over his head.

31. "Chico" then forwarded the *same picture* on his cell phone to Redmon's cell phone—which showed Hensley, in his FlexSol company uniform—wearing a white sheet over his head, resembling a Ku Klux Klan hood. (*See* Exhibit A to Complaint, which is an accurate copy of the picture of Hensley).

32. Upon information and belief, because Redmon made several complaints to Johnson about Hensley's continued racist conduct (including Redmon's knowledge about a recent picture which captured Hensley wearing a white sheet over his head, resembling a Ku Klux Klan hood), and those complaints were repeated to Plant Manager Redman and Human Resources, Plant Manager Redman and his friend, another supervisor, Tony David (Caucasian), made efforts to build a disciplinary record against Redmon, so that they could either pressure Redmon to stop reporting Hensley's conduct or to terminate Redmon.

33. For instance, on or about July 2017, following a plant-wide inspection by the Food and Drug Administration, Plant Manager Redman wrote up and suspended Redmon for three days on the ground that Redmon failed to cover up his beard completely with a beard net, even though Redmon had a beard net resting below his chin.

34. In direct contrast, Plant Manager Redman did not discipline Hensley, who was not wearing a beard net *at all*, or another Caucasian employee, whose beard net was resting *on top of his head* during the inspection, although all employees who were on the plant floor during the inspection were also required to do so.

35. On or about November 2017, as Redmon concluded his shift, Tony David approached Redmon and said "you got my machine running, *boy*?"

6

36. Taken aback by David's question and the derogatory manner in which David asked the question, Redmon asked David to repeat himself, and David again referred to Redmon as "boy," this time, using an even more offensive tone of voice.

37. Redmon told David that referring to him as "boy"—given that Redmon was obviously an adult man— was racially offensive, but David did not apologize.

38. Shortly thereafter, Redmon complained to David Johnson about Tony David's comment.

39. Once again, upon information and belief, Johnson shared Redmon's concerns about David's comment with one of FlexSol's Human Resources representatives and Plant Manager Redman.

40. But just like with Redmon's previous complaints against Hensley, FlexSol did not take any corrective action against David.

41. Meanwhile, Redmon continued to witness Hensley make nooses, wear white sheets over his head at work, and say racist statements at work. Yet, despite Redmon's continued complaints to Johnson, and upon information and belief, Johnson's later reporting of Redmon's complaints to Human Resources and Plant Manager Redman, nothing changed.

42. On or about late-February 2018, David replaced Martin as Redmon's new direct supervisor.

43. Sometime shortly thereafter, Redmon informed David that he could not work on Sundays because of his lifelong religious belief of not working on Sundays and his related, unpaid service as an Associate Minister at a nearby Baptist church.

44. Unlike Redmon's former direct supervisor, David immediately opposed Redmon's scheduling request. David told Redmon that if he was ever scheduled to work on a Sunday, Redmon would have to work on that Sunday.

45. Another day, David approached Redmon, claiming that he had reviewed Martin's notes concerning Redmon's work performance and claimed that he was not sure how many points Redmon had on his disciplinary record because he could not read Martin's handwriting.

46. When Redmon insisted that he maintained a positive work performance, David—without providing Redmon with any justification for doing so—said that he would just put five-and-a-half points on Redmon's record. (At the time, FlexSol terminated employees for accumulating a minimum of six points on their disciplinary record.)

47. David also began assigning Redmon to particular machines which, for safety reasons, required Redmon's undivided attention for extended periods of time. Upon information and belief, David made these machine assignments in an effort to prevent Redmon from having short breaks throughout the day to visit Johnson's office and complain further about Hensley and David's racist conduct.

48. On or about early-March 2018, David told Redmon that he needed to work on an upcoming Sunday.

49. Redmon reminded David that he could not work on Sundays because of his lifelong religious beliefs and longtime service as an Associate Minister at a nearby Baptist church. Redmon also informed David that one of his co-workers was more than willing to work on the upcoming Sunday, so that enough employees would be present for the particular shift.

50. When David would not accommodate to Redmon's scheduling request (which was based upon his religious objection to work on Sundays), Redmon raised his concerns directly with

8
Case 5:19-cv-00124-KDB-DSC   Document 10   Filed 12/13/19   Page 8 of 19

Plant Manager Redman—who had consistently accommodated to Redmon's previous scheduling requests, starting when Redmon was first hired in December 2012.

51. This time, however, Plant Manager Redman challenged Redmon, asking him whether his church services or his job would pay more—signaling to Redmon that if he wanted to keep his job, he needed to skip his religious services and work on the upcoming Sunday.

52. On or about March 13, 2018, after Redmon refused to work on the upcoming Sunday, David terminated Redmon's employment.

53. Upon information and belief, in addition to Redmon's refusal to work on Sundays, FlexSol terminated Redmon because he complained multiple times about Hensley and David's racist conduct.

54. Upon information and belief, Redmon was replaced by David's son (Caucasian).

55. On or about March 13, 2018, Redmon filed a Charge of Discrimination with the EEOC, No. 430-2018-01496.

56. Upon information and belief, *after* FlexSol was served with Redmon's EEOC Charge, FlexSol terminated Hensley for wearing a white sheet over his head, resembling a Ku Klux Klan hood—even though Johnson, Plant Manager Redman, David, and Human Resources had already known about Hensley's conduct in 2017 (displayed in Exhibit A).

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Racial Discrimination)
### Title VII of the Civil Rights Act of 1964—42 U.S.C. § 2000e-2

57. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

58. FlexSol terminated Redmon because of his race. Redmon, as an African-American, is a member of a protected class, was meeting the performance expectations of his employer, was terminated, and was replaced by an individual outside of Redmon's protected class.

59. At the time of Redmon's termination, Plant Manager Redman and David falsely claimed that Redmon was not meeting his job expectations because Redmon and David wanted, in part, to replace Redmon with a Caucasian employee.

60. FlexSol's desire to terminate Redmon and replace him with a Caucasian employee is further supported by the disparate discipline administered by Plant Manager Redman and David, who failed to discipline Hensley for his multiple incidents of racially-infused misconduct, and their decision not to discipline Hensley (and another Caucasian employee) for their failure to wear a beard net during a plant-wide inspection—although *all* employees were required to wear a beard net.

61. Redmon seeks and is entitled to back pay and lost benefits under 42 U.S.C. § 2000e-5(g)(1), for the economic loss he suffered as a result of his termination, compensatory damages under 42 U.S.C. § 1981a, for the emotional distress and injuries he suffered as a result of being terminated because of his race, and punitive damages under 42 U.S.C. § 1981a, because David's actions and decision to terminate Redmon were approved by higher management (including Plant Manager Redman) and exhibited a malicious or reckless indifference for Redmon's rights under Title VII.

62. Redmon also seeks and is entitled to costs and attorney's fees under 42 U.S.C. § 2000e-5(k).

## SECOND CAUSE OF ACTION
### (Religious Discrimination)
### Title VII of the Civil Rights Act of 1964—42 U.S.C. § 2000e-2

63. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

64. At the time of his termination, Redmon was (and still is) a devoted Baptist who served (and still serves) as an Associate Minister at a nearby Baptist church, and who objected to (and still objects to) working on Sundays.

65. Plant Manager Redman and David expressly claimed that Redmon was not meeting his job expectations because Redmon refused to work on Sundays.

66. Redmon requested a religious accommodation, which had been previously granted by FlexSol for several years, the religious accommodation did not present a hardship or unreasonable burden to FlexSol, and Redmon identified an employee who was willing to work on the Sunday at issue, in order to meet FlexSol's personnel needs.

67. Redmon seeks and is entitled to back pay and lost benefits under 42 U.S.C. § 2000e-5(g)(1), for the economic loss he suffered as a result of his termination, compensatory damages under 42 U.S.C. § 1981a, for the emotional distress and injuries he suffered as a result of being terminated because of his religious objection to working on Sundays, and punitive damages under 42 U.S.C. § 1981a, because David's actions and decision to terminate Redmon were approved by higher management (including Plant Manager Redman) and exhibited a malicious or reckless indifference for Redmon's rights under Title VII.

68. Redmon also seeks and is entitled to costs and attorney's fees under 42 U.S.C. § 2000e-5(k).

## THIRD CAUSE OF ACTION
### (Retaliation—Race)
### Title VII of the Civil Rights Act of 1964—42 U.S.C. § 2000e-3

69. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

70. Redmon, in good faith, complained multiple times to Johnson and Hartsell about Hensley and David's unwelcomed racist comments and actions, and upon information and belief, Johnson reported Redmon's complaints to one of FlexSol's Human Resources representatives and Plant Manager Redman.

71. Because Redmon continued to complain about his co-workers' racially-offensive conduct, FlexSol terminated his employment, and as pretext, falsely claimed that Redmon was not meeting his job expectations.

72. Redmon seeks and is entitled to back pay and lost benefits under 42 U.S.C. § 2000e-5(g)(1), for economic loss he suffered as a result of his termination, compensatory damages under 42 U.S.C. § 1981a, for the emotional distress and injuries he suffered as a result of being terminated in retaliation for raising concerns of his co-workers' racially-offensive conduct, and punitive damages under 42 U.S.C. § 1981a, because Hensley and David's actions were approved by higher management (including Plant Manager Redman) and exhibited a malicious or reckless indifference for Redmon's rights under Title VII.

73. Redmon also seeks and is entitled to costs and attorney's fees under 42 U.S.C. § 2000e-5(k).

## FOURTH CAUSE OF ACTION
### (Retaliation—Religion)
### Title VII of the Civil Rights Act of 1964—42 U.S.C. § 2000e-3

74. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

75. Redmon, in good faith, complained to Plant Manager Redman about David's demand that Redmon work on Sundays.

76. Because Redmon complained about FlexSol's failure to accommodate to his religious opposition to working on Sundays, FlexSol terminated his employment.

77. Redmon seeks and is entitled to back pay and lost benefits under 42 U.S.C. § 2000e-5(g)(1), for economic loss he suffered as a result of his termination, compensatory damages under 42 U.S.C. § 1981a, for the emotional distress and injuries he suffered as a result of being terminated in retaliation for raising concerns about being pressured to work on Sundays, and punitive damages under 42 U.S.C. § 1981a, because David's actions were approved by higher management (including Plant Manager Redman) and exhibited a malicious or reckless indifference for Redmon's rights under Title VII.

78. Redmon also seeks and is entitled to costs and attorney's fees under 42 U.S.C. § 2000e-5(k).

## FIFTH CAUSE OF ACTION
### (Discrimination in Termination of Employment—Race)
### 42 U.S.C. § 1981

79. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

80. The act of racial discrimination complained of herein and described in the First Cause of Action also constitutes an impairment of contract based upon race, in violation of 42 U.S.C. § 1981, and is actionable under 42 U.S.C. § 1983.

81. Redmon seeks and is entitled to back pay and lost benefits for the economic injuries he suffered as a result of his termination, compensatory damages for the emotional distress and injuries he suffered from being terminated because of his race, and punitive damages, as the actions of FlexSol's managerial officers exhibited a willful and wanton disregard for Redmon's rights under 42 U.S.C. § 1981.

82. Redmon also seeks and is entitled to attorney's fees under 42 U.S.C. § 1988.

## SIXTH CAUSE OF ACTION
### (Retaliation in Termination of Employment—Race)
### 42 U.S.C. § 1981

83. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

84. The act of retaliation complained of herein and described in the Third Cause of Action also constitutes an impairment of contract based upon race, in violation of 42 U.S.C. § 1981, and is actionable under 42 U.S.C. § 1983.

85. Redmon seeks and is entitled to back pay and lost benefits for the economic injuries he suffered as a result of his termination, compensatory damages for the emotional distress and injuries he suffered from being terminated in retaliation for raising concerns of his co-workers' racially-offensive conduct, and punitive damages, as the actions of FlexSol's managerial officers exhibited a willful and wanton disregard for Redmon's rights under 42 U.S.C. § 1981.

86. Redmon also seeks and is entitled to attorney's fees under 42 U.S.C. § 1988.

## SEVENTH CAUSE OF ACTION
### (Wrongful Discharge—Race Discrimination and Retaliation)
### N.C. Gen. Stat. § 143-422.22

87. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

88. The North Carolina General Assembly has enacted the North Carolina Equal Employment Practices Act, which declares that:

> (a) It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of [ . . .] race [ . . .] by employers which regularly employ 15 or more employees.

> (b) It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

89. FlexSol's termination of Redmon because of his race and in retaliation for raising concerns about his co-workers' racially offensive conduct (including Hensley's making of nooses and wearing a white sheet over his head, resembling a Ku Klux Klan hood, and David referring to Redmon as "boy") violated North Carolina's aforementioned public policy, and therefore, Redmon's termination was wrongful and unlawful.

90. Because of this wrongful discharge, Redmon has suffered a loss of employment, income, and benefits, as well as humiliation and emotional distress. Accordingly, Redmon seeks and is entitled to back pay, lost benefits, and compensatory damages.

91. Hensley and David's actions were approved by higher management (including Plant Manager Redman) and exhibited a willful and wanton disregard for Redmon's rights under

North Carolina law, and therefore, such actions are contrary to the State's public interest. Therefore, Redmon also seeks and is entitled to punitive damages from FlexSol to the maximum extent allowed by Chapter 1D of North Carolina's General Statutes.

## EIGHTH CAUSE OF ACTION
### (Wrongful Discharge—Religious Discrimination and Retaliation)
### N.C. Gen. Stat. § 143-422.22

92. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

93. The North Carolina General Assembly has enacted the North Carolina Equal Employment Practice Act, which declares that:

> (a) It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of [ . . .] religion [ . . .] by employers which regularly employ 15 or more employees.

> (b) It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

94. FlexSol's termination of Redmon because of his religious objection to working on Sundays and in retaliation for raising concerns to Plant Manager Redman about David's demand for Redmon to work on Sundays violated North Carolina's aforementioned public policy, and therefore, Redmon's termination was wrongful and unlawful.

95. Because of this wrongful discharge, Redmon has suffered a loss of employment, income, and benefits, as well as humiliation and emotional distress. Accordingly, Redmon seeks and is entitled to back pay, lost benefits, and compensatory damages.

16
Case 5:19-cv-00124-KDB-DSC   Document 10   Filed 12/13/19   Page 16 of 19

96. David's actions were approved by higher management (including Plant Manager Redman) and exhibited a willful and wanton disregard for Redmon's rights under North Carolina law, and therefore, such actions are contrary to the State's public interest. Therefore, Redmon also seeks and is entitled to punitive damages from FlexSol to the maximum extent allowed by Chapter 1D of North Carolina's General Statutes.

## JURY DEMAND

Redmon demands that all matters not suitable for determination by the Court be decided by a jury of his peers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Reggie Redmon respectfully requests:

1. An award of actual damages (back pay and lost benefits) and compensatory damages against Defendant, as allowed by 42 U.S.C. §§ 1981 and 1983, Title VII, and the common law of North Carolina;

2. An award of punitive damages against Defendant, as allowed by 42 U.S.C. §§ 1981 and 1983, Title VII, and Chapter 1D of North Carolina's General Statutes;

3. The costs and expenses in this action, including reasonable attorney's fees from Defendant, as allowed by 42 U.S.C. §§ 1988 and 2000e-5(k); and

4. Such other and further relief as the Court deems just and necessary.

Date: December 13, 2019

Respectfully submitted,

**/s/ Cheyenne N. Chambers**
Cheyenne N. Chambers (N.C. Bar #48699)
TIN, FULTON, WALKER & OWEN, PLLC
301 East Park Avenue
Charlotte, NC 28203
Tel.: 704-338-1220
Fax: 704-338-1312
E-mail: cchambers@tinfulton.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing Verified Amended Complaint with the Clerk of Court by using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.


Date: December 13, 2019 **/s/ Cheyenne N. Chambers**