**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:19-CV-00124-KDB-DSC**

| | |
|---|---|
| **REGGIE REDMON,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **FLEXSOL PACKAGING CORPORATION,** | |
| **Defendant.** | |

Plaintiff Reggie Redmon was a factory employee at Defendant Flexsol Packaging Corporation ("Flexsol") until he was terminated in March 2018. Redmon alleges in this action that he was discriminated against because of his race (African American) and religion (Baptist) and that he is the victim of unlawful retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), 42 U.S.C. § 1981 and the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.22. Now before the Court is Defendant's Motion for Summary Judgment on all claims (Doc. No. 25).

After careful consideration of the motion, the parties' memoranda and exhibits in support and in opposition to the motion and the oral argument of the parties at a hearing on the motion on March 22, 2021, the Court will grant the motion in part and deny it in part. The Court finds that Flexsol is entitled to summary judgment on Plaintiff's religious discrimination and accompanying retaliation claims. However, the Court finds that there are genuinely disputed issues of material facts on Plaintiff's claims of racial discrimination and related retaliation so Flexsol is not entitled

1

to summary judgment on those claims. Therefore, whether or not Mr. Redmon was subject to unlawful racial discrimination must be decided by the jury at the trial of this matter, if the case is not resolved earlier by the parties.[1]

## I.    LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere

---

[1] The Court greatly appreciates counsel's collegiality and expressions of mutual appreciation for being able to work together cooperatively in a matter that understandably engenders passion among the parties. The Court encourages counsel to continue to work together and with their respective clients to carefully explore whether, notwithstanding the strong personal feelings involved, a compromise resolution can be reached in this matter.

2

allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477 U.S. at 255. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

3

## II.    FACTS AND PROCEDURAL HISTORY

Reggie Redmon is an African-American male and a lifelong Baptist who resides in Iredell County, North Carolina. In December 2012, Flexsol, a manufacturer of plastics and other packaging materials, hired Plaintiff to work in its Statesville plant as a Repel Operator. As discussed in more detail below, the parties characterize Redmon's employment with Flexsol in starkly different terms. According to his former direct supervisor Mike Martin, Plaintiff  was a "productive worker," a "nice person" and "a religious man." *See* Doc. No. 28-6 at 2. But, in Flexsol's telling, Redmon "was constantly a problem employee" who "was often tardy, missed work frequently, was insubordinate and often had a bad attitude." While a few facts are undisputed (primarily with respect to the circumstances related to Plaintiff's claims of religious discrimination), these broadly divergent views of Plaintiff's employment are emblematic of the state of much of the record before the Court.

### A.    Allegations Related to Religious Discrimination

There appears to be no dispute that Plaintiff is a religious man who observes Sundays as the Sabbath and generally abstains from participating in any secular work on that day. Indeed, on Sundays Plaintiff volunteers as an associate minister at a Baptist Church, where he plays the piano and drums and teaches Sunday school. Also, Flexsol does not dispute that at the start of his employment, Plaintiff informed his Plant Manager Jim Redman ("PM Redman") and his then direct supervisor Mike Martin that he could not engage in secular work on Sundays because of his religious beliefs.

Flexsol's overtime policy is, however, similarly undisputed. While overtime was not always required, "[i]n instances where overtime is necessary, employees are expected to work the

4

hours." Doc. No. 25-1 at 70. To assign overtime, FlexSol used a system that combined an opportunity for employees to voluntarily sign up for the mandatory overtime (choosing a particular day depending on the employee's preference) and a lottery for filling any overtime needs that had not been met by the employee self-selection process. *See* Doc. No. 25-30 at ¶¶ 9-10. Specifically, if any overtime slots remained after all employees had a chance to sign up for those slots, a drawing would occur where each employee who had not signed up for a slot would have their name put in a drawing. Those chosen in the lottery would then be assigned the remaining slots. This system effectively allowed Flexsol's employees to avoid being required to work on a particular day of the week, so long as they voluntarily selected an overtime slot and thus avoided the lottery.

For his entire five year tenure at Flexsol until the events at issue here, Flexsol's overtime allocation system accommodated Plaintiff's desire to avoid working on Sunday. Plaintiff preferred not to work overtime so he did not regularly sign up for overtime; however, either because other employees volunteered to work on Sunday or he was not chosen in the lottery, Plaintiff was never scheduled for Sunday overtime. *See* Doc. No. 25-30 at ¶¶ 11-16, 23; Doc. No. 25-7 at ¶¶ 7, 17-19.

Plaintiff's overtime lottery luck ran out in March 2018. Flexsol required employee overtime on Sunday March 11, 2018 as well as other days during the preceding week. Because he did not sign up for any other, non-Sunday overtime shifts earlier that week, Redmon was placed into the overtime lottery, in which he was randomly chosen to work on Sunday March 11. In response to this selection, Plaintiff testified that he requested that he not be required to work Sunday because of his religious beliefs and offered to work a Saturday instead. However, while Plaintiff suggests that other employees might have been willing to "switch" overtime schedules

5

which would have allowed him to avoid Sunday work, he has not identified any specific employee who was both willing and eligible to work that Sunday. *See* Doc. No. 25-7 at ¶18. In any event, Flexsol refused to allow Redmon to change his lottery assigned Sunday overtime.[2] When Redmon did not work on Sunday March 11, Flexsol charged him with an unexcused absence (which Flexsol says led to his termination for accumulating too many points for poor attendance – a conclusion which is hotly disputed as discussed below).

B.    Allegations Related to Racial Discrimination

Plaintiff's allegations related to his claims of racial discrimination begin in June 2016. During a lunch break at work, Plaintiff alleges that he watched one of his co-workers, a white maintenance employee named David Hensley, tie some rope together to make a noose. Doc. No. 28-2 at ¶ 13. As Hensley made the noose, Plaintiff says that he approached Hensley and explained to him the deep-rooted, racist history surrounding nooses, how Hensley's conduct offended him, and how other Black employees at FlexSol would be negatively impacted if they saw Hensley's noose. *Id*. at ¶ 14. Hensley allegedly dismissed Plaintiff's comments, responding that what he was doing was not a problem, and that "slavery happened a long time ago." *Id*. at ¶ 15.

---

[2] Plaintiff also testified that in refusing to allow him to avoid Sunday work after he was chosen to do so in the lottery, PM Redman allegedly said to him, "Which pays more your church services or your job," a comment which PM Redman denies making. However, even assuming the comment was made and intended to convey to Plaintiff that if he did not work on Sunday he was going to be making a choice that would lead to the loss of his job, the Court does not find the comment independently or in combination with other facts reflects religious discrimination under these circumstances. Rather, while no doubt poorly worded, the statement is simply an accurate reflection of the consequence of Plaintiff's choice not to sign up for a non-Sunday overtime period and avoid the risk of the lottery. That is, based on the undisputed facts, the Court must conclude that Plaintiff himself rather than Flexsol created the difficult predicament reflected in PM Redman's alleged comment.

Plaintiff testified that he reported the incident the same day to Facility Planner David Johnson; one of the Plant's Leadmen, Nick Hartsell and Plaintiff's Supervisor Martin (all of whom are white). *See* Doc. No. 28-2 at ¶ 16; Doc. No. 28-7 at 1–2; Doc. No. 28-4 at 5:22–25; Doc. No. 28-6 at 1; Doc. No. 28-9 at 13:16–14:25, 30:22–25, 31:25–32:19, 67:19–20, 72:3–73:17, 75:9–76:5, 77:17–78:4.[3] Johnson and Hartsell allegedly tried to diffuse Plaintiff's concerns, telling Plaintiff that Hensley was "stupid," that Hensley simply "did not know any better," and that it would be best for Plaintiff and any other Black employees to just ignore Hensley. Supervisor Martin further testified that he was "sure" that Hensley's behavior would have been brought to the attention of PM Redman at "morning meetings" among supervisors and administrators, but he does not say specifically whether he or someone else provided the information or when it was provided. *See* Doc. No. 28-6 at pp. 3–4. In any event, there is no evidence that Flexsol took any corrective action against Hensley as a result of this conduct.

Sometime soon after FlexSol failed to discipline Hensley for making a noose, Plaintiff witnessed Hensley make another noose at work. Over time, Plaintiff also heard Hensley make several racist comments, including one statement in which Hensley associated Black people with monkeys. Plaintiff also witnessed Hensley wearing white sheets over his head that had two holes

---

[3] The parties respectively argue that Plaintiff either correctly or incorrectly reported his allegations of racial harassment to Flexsol based on different sections of the employee handbook. *Compare* Doc. No. 25-1, at 3 (The first step if you have a problem is to discuss the concern with your Supervisor) with *id.* at 4 ("Any employee who believes he or she has been subjected to any form of harassment or who witnessed harassment shall immediately report the harassment to the Human Resources Department."). However, because Plaintiff has not asserted any claim for discrimination based on a hostile work environment the path Plaintiff chose to express his concerns about Hensley's conduct has limited relevance. There appears, at a minimum, to be alleged facts that establish that at least some members of Flexsol management had knowledge about Hensley's conduct and took no disciplinary action until after Plaintiff was terminated (as discussed below).

cut out around his eyes—resembling a hood donned by some members of the Ku Klux Klan. Doc. No. 28-2 at ¶ 27; Doc. No. 28-9 at 67:24–69:8. Plaintiff's Supervisor Martin recalls a separate incident when several Black employees, including Plaintiff, complained to him about Hensley placing a blue pointed cap on his head, in an effort to dress like what resembled as another symbol of the KKK. Doc. No. 28-6 at 3–4. Later, in March 2017 a Latino employee Jesus "Chico" Reyes, who had himself been called racial slurs by Hensley, gave Plaintiff a picture of Hensley, in his FlexSol uniform, wearing a white sheet over his head, resembling a KKK hood. Doc. No. 28-9 at ¶ 31; Doc. No. 28-10. No disciplinary action was taken against Hensley, until he was terminated after Flexsol was confronted with the picture during a meeting with the EEOC following Plaintiff's termination.[4] See Doc. No. 25-7 at ¶ 14.

Plaintiff alleges that PM Redman along with his work friend Tony David, a white nighttime Supervisor, then retaliated against him because of his complaints about Hensley and other racial disparities at Flexsol.[5] (As discussed above, Flexsol strongly disputes this contention, describing a long list of instances of missed and tardy attendance and disciplinary problems as the reason for Plaintiff's ultimate termination. *See* Doc. 26 at 4-6). In April 2017, PM Redman ordered Supervisor Martin to write-up Plaintiff for using a cell phone at work, but allegedly did not order

---

[4] Each time a supervisor spoke with Hensley about his misconduct, Hensley would simply characterize the claims as him "just joking." Doc. No. 28-6 at p. 4.

[5] Plaintiff also testified at his deposition about a meeting with PM Redman, a Human Resources employee and Johnson to complain about PM Redman's disparate treatment of employees with respect to picking up lunches. Specifically, PM Redman stopped a Black maintenance employee, Mike Wilson, from leaving the facility to pick up lunch for the hourly employees, while allowing Hensley to keep getting lunch for the salaried-managerial employees, all of whom were white. At first, PM Redman stopped both Wilson and Hensley from leaving the facility, but after a few weeks allowed only Hensley to leave the facility to get lunch for management. *See* Doc. No. 28-9 at 19:23–21:6; Doc. No. 28-3 at 66:17–67:19; Doc. No. 28-7 at 1–2.

Martin to take the same action against a white employee, Bobby Allan Moody, for the same conduct. *See* Doc. No. 28-9 at 82:4–84:22; Doc. No. 28-7 at 2–3.

Even more pointedly, on or about November 2017, as Plaintiff concluded his daytime shift, then night shift Supervisor David, who has a history of referring to Black employees as "the N-Word," approached Plaintiff and said, "you got my machine running, boy?" *See* Doc. No. 28-2 at ¶ 35; Doc. No. 28-7 at 2. Plaintiff asked David to repeat himself. David again referred to him as "boy," allegedly using an even more offensive tone of voice. *Id.* at ¶ 36. Plaintiff told David that referring to him as "boy" when he was obviously an adult was racially offensive. David did not apologize. Shortly thereafter, Plaintiff complained to Johnson and Martin about David's allegedly racist comment. Further, Plaintiff contends his concerns about David's comment were shared with PM Redman, but FlexSol did not take any corrective action against David.

In late February 2018, David moved to the day shift and replaced Martin as Plaintiff's direct supervisor. Not long after, David approached Plaintiff, stating that he had reviewed Martin's notes concerning Plaintiff's work performance and said that he was not sure how many points Plaintiff had on his disciplinary record because he could not read Martin's handwriting.[6] So, David said that he would just put five-and-a-half points on Plaintiff's record, a total that placed Plaintiff just a half a point (one mistake or instance of tardiness) away from termination. Plaintiff disputed this total and would not sign the documentation of this decision.

Flexsol's attendance policy is undisputed as written but is disputed in its practical application. According to the employee handbook, six occurrences of absenteeism or tardiness

---

[6] David did not meet with Martin to get any clarification about his handwritten notes. *See* Doc. No. 28-6 at 2–3.

9

during a rolling 12-month calendar results in termination. If an employee has perfect attendance for 90 days, he can earn back one occurrence of absenteeism or tardiness. An employee is considered tardy if he punches in four minutes after his scheduled starting time, and one tardy is one-half of an occurrence. *See* Doc. No. 25-1 at 82; Doc. No. 25-7 at ¶ 5. In other words, a complete day of missing work counts as one point and a tardy counts as half a point, with a total accumulation of six points in a rolling annual calendar meaning that the employee may be terminated. However, the parties dispute whether supervisors had discretion to impose points for "tardiness," with PM Redman and Flexsol testifying that such discretion was not permitted and Supervisor Martin specifically testifying that he exercised discretion in declaring an employee to be tardy with the express permission of PM Redman. *Id.* at ¶ 6; Doc. No. 28-6 at 1–3.

In sum, the number of attendance points that Plaintiff had as of his termination date is disputed. Plaintiff claims that before leaving as his supervisor, Martin had a meeting with Plaintiff to discuss his point total in which Martin told Plaintiff that he was doing well on his points and that he was not on the brink of being terminated. *See* Doc. No. 28-9 at 61:2–10; Doc. No. 28-6 at 2. And, again, Flexsol contends that Plaintiff had accumulated far more than 6 attendance points at the time of his termination and had other prior discipline issues. *See* Doc. No. 25-4, p. 60-63; Doc. Nos. 25-24, 25-25.[7]

As discussed above, Plaintiff's termination occurred in March 2018 (roughly four months after Plaintiff complained about being called a "boy") after Plaintiff failed to work on Sunday

---

[7] The parties also dispute Plaintiff's behavior in connection with a July 2017 plant-wide audit after which PM Redman wrote up and suspended Plaintiff on the ground that Plaintiff failed to cover his beard completely with a net. Specifically, the parties disagree on whether Plaintiff admitted his mistake and apologized and whether employee Hensley should have been similarly disciplined.

March 11 and thus, according to Flexsol, accumulated more than 6 points, justifying termination. On March 13, 2018, David recommended Plaintiff's termination, and PM Redman, approved it.

To challenge his termination, Plaintiff filed an EEOC Charge of Discrimination on March 16, 2018. The EEOC issued Plaintiff a Notice of Right to Sue on June 27, 2019. Plaintiff filed his initial Complaint on September 24, 2019 and his Verified Amended Complaint on December 13, 2019 bringing eight causes of action: (1) Racial Discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2; (2) Religious Discrimination under Title VII; (3) Retaliation based upon Race under Title VII, 42 U.S.C. § 2000e-3; (4) Retaliation based upon Religion under Title VII; (5) Racial Discrimination in Termination of Employment pursuant to 42 U.S.C. § 1981; (6) Retaliation based upon Race in Termination of Employment pursuant to § 1981; (7) Wrongful Discharge based upon Race Discrimination and Retaliation under the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.22; and (8) Wrongful Discharge based upon Religious Discrimination and Retaliation under NCEEPA.

### III.    DISCUSSION

#### A.    Race Discrimination

Redmon alleges that he was discharged due to his race in violation of Title VII of the Civil Rights Act of 1964.  A plaintiff may establish a Title VII violation in two ways. First, a plaintiff may demonstrate through direct evidence that illegal discrimination motivated an employer's adverse employment action. Alternatively, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See generally Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc); *Cherry v. Elizabeth City State University*, 147 F. Supp. 3d 414, 421 (E.D.N.C. 2015).

11

Direct evidence is evidence from which no inference is required. To show race discrimination by direct evidence, a plaintiff typically must show discriminatory motivation on the part of the decisionmaker involved in the adverse employment action. *See Hill*, at 286–91. Such direct evidence would include a decisionmaker's statement that he did not promote a plaintiff due to his race. *See id*. at 303. The decisionmaker must be either the employer's formal decisionmaker or a subordinate who was "principally responsible for," or "the actual decisionmaker behind," the allegedly discriminatory action. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 151–52, (2000); *Holley v. N.C. Dep't of Admin*., 846 F. Supp. 2d 416, 427 (E.D.N.C.2012).

Here, while there is some evidence of racial animus in David's "boy" comment and his alleged history of racial remarks and at least one allegation of a racially questionable comment by PM Redman, *see* Doc. No. 28-6 at 4, Plaintiff has focused on (and the Court finds he has satisfied at this stage) the *McDonnell Douglas* test so the Court need not decide if there is sufficient proffered direct evidence of racial discrimination by any of the Flexsol decisionmakers.[8]

However, even without direct evidence of race discrimination, a plaintiff's Title VII claim can survive summary judgment if the plaintiff raises a genuine issue of material fact under the burden-shifting framework established in *McDonnell Douglas*. Under this analysis, a plaintiff must first establish a prima facie case of discrimination. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509

---

[8] Courts should not quickly attribute "to any ultimate decision maker ... the most unfortunate expressions and beliefs of those around him." *Merritt v. Old Dominion Freight Line, Inc*., 601 F.3d 289, 300 (4th Cir. 2010). "[T]hat any distasteful comments will arise in the workplace" is regrettable. *Id.* "[B]ut that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." *Id*.; *see Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), overruled on other grounds by *Desert Palace. Inc. v. Costa*, 539 U.S. 90 (2003).

12

U.S. 502 (1993); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the defendant took the adverse employment action "for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254. If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons but were a pretext for discrimination." *Hill*, 354 F.3d at 285 (quotation omitted).

The elements of a prima facie claim of discrimination under Title VII are well established. "The plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973)).

Alternatively, to establish a prima facie case of discrimination in the enforcement of employee disciplinary measures, the plaintiff must show: (1) that he is a member of a class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *See Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir. 1985).

For purposes of this motion, Flexsol does not dispute that Redmon is within a protected class for the purpose of making a claim for race discrimination. Also, there is no dispute that

13

Redmon was terminated, which is an adverse employment action. Therefore, the elements of Redmon's prima facie case at issue are "satisfactory job performance" and "different treatment from similarly situated employees outside the protected class." In the "alternative" prima facie case, the parties dispute whether he engaged in "misconduct" and, even if he did, whether his discipline was more severe than enforced against employees outside the protected class. As discussed below, there are disputed factual issues for all these elements.

In order to create a triable issue regarding the issue of satisfactory job performance, "a plaintiff must proffer evidence of a genuine dispute concerning whether, 'at the time of his dismissal, he was performing his job in a way that met the legitimate expectations of [the defendant]. Specifically, the Court looks to the perception of the decision-maker in considering whether the employee was meeting job expectations at the time of dismissal.'" *Reid v. Dalco Nonwovens, LLC*, 154 F. Supp. 3d 273, 285 (W.D.N.C. 2016) (quoting *Pettis v. Nottoway Cnty. Sch. Bd.*, 980 F. Supp. 2d 717, 725 (E.D. Va. 2013)).

In *Haynes v. Waste Connections, Inc*., 922 F.3d 219, 225 (4th Cir. 2019), the Fourth Circuit discussed this "satisfactory job performance" requirement, overruling a District Court decision that the employee had not established a prima facie case of discrimination under Title VII. In *Haynes*, the court held that, "a showing of satisfactory performance does not require the plaintiff to show that he was a perfect or model employee. Rather, a plaintiff must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Id.* (citing *Warch v. Ohio Cas. Ins. Co*., 435 F.3d 510, 515–16 (4th Cir. 2006)). Specifically, the court found that testimony submitted by the employee that the employer had "told him in September 2015" (a few weeks before his termination) that "everything looks good" and there was "nothing to worry

14

about regarding his upcoming performance review" raised "the reasonable inference—which must be drawn in Haynes's favor at this stage—that he was performing at a satisfactory level." Also, the Haynes court rejected the employer's argument that Haynes "failed to perform satisfactorily by sending a text to Fountain in violation of company policy," holding that "a dispute of fact would still exist as to whether Haynes met his employer's legitimate expectations at that time, because evidence in the record suggests that Haynes routinely communicated with Fountain via text." *Id.* Thus, the Fourth Circuit concluded that the employee had successfully presented a prima facie case of discrimination.

The facts in this case are similar to *Haynes*. Here, Redmon has testified that he was told by his long time Supervisor Martin that he was doing fine on his attendance and otherwise. So, although Flexsol presents what it contends is substantial evidence that Plaintiff was not meeting Flexsol's work expectations, particularly with respect to attendance, under the authority of *Haynes*, it appears that Redmon has sufficiently established for purposes of this motion that he has met the "satisfactory job performance" element of his prima facie case of race discrimination.

Plaintiff has also satisfied the final element that similarly situated employees were treated more leniently. To demonstrate a triable issue on the fourth element of the prima facie case, a plaintiff must show that employees outside his protected class were similarly situated in all relevant respects, though they need not have engaged in "precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances[.]" *Cook*, 988 F.2d at 511. Although Flexsol argues that Plaintiff has failed to identify a *specific* white employee who was treated differently than Plaintiff with respect to its attendance policy, the evidence establishes at least a disputed issue on this element based on Plaintiff's claims that he did

15

not have more than 6 attendance points and was therefore not subject to termination. That is, comparable white employees with less than 6 points were not terminated.

Accordingly, Redmon has established a "prima facie" case of race discrimination. Similarly, with respect to the "alternative" prima facie case of discriminatory discipline, Redmon has proffered evidence that he is in a protected class, he had an attendance record as good as other employees and less discipline (or no discipline) was imposed on the white employees.

By establishing a prima facie case, Redmon shifts the burden to Flexsol to provide a legitimate, non-discriminatory reason for its decision to terminate Redmon. A defendant's burden of providing a legitimate, non-discriminatory reason is one of production, not persuasion. *St. Mary's Honor Ctr.*, 509 U.S. at 509. A defendant must present its legitimate, non-discriminatory reason "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56. Flexsol asserts that Redmon was terminated because he exceeded the allowable number of work absences and late arrivals to work. If true, this is plainly a legitimate, non-discriminatory reason for termination.

Thus, the burden shifts back to Redmon to demonstrate that Flexsol's justification is a pretext for race discrimination. *See, e.g., Hux v. City of Newport News*, 451 F.3d 311, 314–15 (4th Cir. 2006). The Fourth Circuit has held that "'when an employer articulates a reason for discharging the plaintiff' that the statute does not proscribe, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" *Villa v. CavaMezze Grill, LLC,* 858 F.3d 896, 901 (4th Cir. 2017) (*quoting DeJarnette v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir. 1998)). However, if a jury could find the "proffered explanation for the discharge . . . 'unworthy of credence,'" then summary

judgment for the employer is improper. *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 295 (4th Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). In conducting this analysis, the court does not sit to decide whether the defendant in fact discriminated against the plaintiff based on race. *See, e.g., Holland v. Washington Homes, Inc*., 487 F.3d 208, 217 (4th Cir. 2007); *Hawkins v. PepsiCo, Inc*., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the focus concerns whether plaintiff has raised a genuine issue of material fact as to pretext. *See, e.g., Hux*, 451 F.3d at 314–19; *Dugan v. Albemarle Cty. Sch. Bd*., 293 F.3d 716, 722 (4th Cir.2002).

Considering the record and viewing all inferences in the light most favorable to Redmon, the Court finds that a jury could conclude that Flexsol ' "proffered explanation for the discharge . . . [is] 'unworthy of credence.'" If the jury believes Supervisor Martin's testimony that Redmon was a capable employee with a satisfactory attendance record then, particularly in light of the direct evidence of Flexsol's numerous racial issues discussed above, it might find Flexsol's asserted explanation to be a pretext for discrimination. In sum, because Redmon has established a genuinely disputed factual issue on whether Flexsol's explanation for Redmon's termination is credible, summary judgment may not be entered against Redmon on his claim of racial discrimination, and it is for the jury to determine if Flexsol unlawfully discriminated against Redmon based on his race.

B.   Religious Discrimination

However, the Court finds that Flexsol is entitled to summary judgment on Redmon's claim of religious discrimination. A plaintiff can assert Title VII religious discrimination claims under two separate theories—disparate treatment or failure to accommodate. *See Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996); *E.E.O.C. v. Abercrombie & Fitch Stores, Inc*.,

573 U.S. 991 (2015); 42 U.S.C. § 2000e–2(a). An allegation of "disparate treatment" alleges "intentional discrimination" under 42 U.S.C. § 2000e–2(a)(1) on the basis of religion. That provision prohibits an employer from (1) "discriminat[ing] against any individual" (2) "because of" (3) "such individual's ... religion." *Id.* § 2000e–2(a)(1). Title VII, in turn, defines religion to "includ[e] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j) (emphasis added). "Because this definition includes a requirement that an employer 'accommodate' an employee's religious expression," an employee alleging intentional discrimination under § 2000e–2(a)(1) can bring suit based on a disparate-treatment theory or a failure-to-accommodate theory. *See Chalmers*, 101 F.3d at 1018 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)).

Redmon's claim of religious discrimination is based on his claim Flexsol should have accommodated his religious beliefs by not requiring him to work on Sunday March 11, 2018. Like his claim of race discrimination, Redmon can avoid summary judgment on his claim of religious discrimination by either providing direct evidence of discrimination or by using the *McDonnell Douglas* analysis. Again, Redmon seeks to prove his claim through *McDonnell Douglas*. With respect to his prima facie case, Redmon has established that he is in a protected class because of his beliefs as a Baptist and that he suffered an adverse employment action when he was terminated. Also, he has established "satisfactory job performance" as discussed above.

However, unlike his race discrimination claim, Redmon has not proffered any evidence that other employees who had different religious beliefs were treated better. Rather, the undisputed

evidence is that all employees had the same opportunity to schedule overtime on a day other than Sunday (or other days that might conflict with a different religious tradition) and thereby not suffer discrimination on account of their religious beliefs. Therefore, Redmon cannot establish a prima facie case of religious discrimination under a disparate treatment theory.

Unlike disparate treatment, under a failure-to-accommodate theory "an employee can establish a claim even though he cannot show that other (unprotected) employees were treated more favorably or cannot rebut an employer's legitimate, non-discriminatory reason for his discharge." *Id.* To establish a prima facie failure-to-accommodate claim, a plaintiff must show (1) he has a bona fide religious belief or practice that conflicts with an employment requirement and (2) the need for an accommodation of that religious belief or practice served as a motivating factor in the employer's adverse employment action. *See Abercrombie & Fitch Stores, Inc.*, *supra*. (clarifying that "the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions").

Here, Redmon alleges that he has a religious belief that conflicts with an employment requirement (that he work overtime on a Sunday). However, as discussed at length above, Flexsol fully accommodated Redmon's (and its other employees') religious beliefs by implementing a policy to allocate overtime which indisputably allowed all employees to avoid working overtime on a sacred day. Therefore, a jury could not reasonably find that Redmon's need for an accommodation, or even his religious beliefs generally, was a motivating factor in his termination. Indeed, Redmon's own failure to schedule overtime on a day other than Sunday led to his absence on that day being considered unexcused (although, again, there remains a significant dispute

19

whether any discipline should have been taken as a consequence).[9] Accordingly, Redmon has failed to establish a prima facie case of religious discrimination under Title VII, and Flexsol is entitled to summary judgment on that claim.

C.   Retaliation

Finally, Redmon asserts that Flexsol retaliated against him for engaging in a protected activity. As with his other claims, Redmon relies on the *McDonnell Douglas* framework. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation. *See, e.g., St. Mary's Honor Ctr*., 509 U.S. at 506; *Burdine*, 450 U.S. at 252–55; *Holland*, 487 F.3d at 218; *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001).

Title VII prohibits an employer from discriminating against his employee because he "has opposed any . . . unlawful employment practice" under Title VII. 42 U.S.C. § 2000e–3(a).  Under Title VII, a plaintiff establishes a prima facie claim for unlawful retaliation by showing: (1) he engaged in protected activity; (2) he experienced an adverse employment action; and (3) a causal link exists between the two events. *See Balas v. Huntington Ingalls Indus., Inc*., 711 F.3d 401, 410 (4th Cir. 2013); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005).

The structure and grounds for Redmon's retaliation claim are more clearly stated with respect to his claims of retaliation based on his complaints regarding racial issues. For the reasons discussed above (both with respect to Plaintiff's racial and religious claims) the Court finds that Plaintiff has sufficiently established a prima facie case and a genuine factual dispute regarding pretext in response to Flexsol's claims of poor job performance with respect to racial but not

---

[9] At oral argument, Plaintiff's counsel conceded that the overtime lottery works as Flexsol contends and that Plaintiff could have avoided working overtime on Sunday had he signed up for overtime on a different day that week.

religious retaliation. Therefore, the Court will deny Defendant's motion for summary judgment on Plaintiff's claim of retaliation on account of race but grant the motion with respect to Plaintiff's claim related to retaliation because of his alleged "protected activity" related to his religious beliefs.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT**:

Flexsol's Motion for Summary Judgment (Doc. No. 25) is hereby **GRANTED** as to counts 2, 4 and 8 of Plaintiff's Amended Complaint and **DENIED** as to the remaining counts,[10] which shall proceed to a trial on the merits in the absence of a voluntary resolution of this dispute by the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: March 23, 2021

Kenneth D. Bell
United States District Judge

---

[10] Plaintiff has disavowed any claim for retaliation in his state law NCEEPA claim in Count 7 so that claim will only proceed as to the discrimination claim which mirrors his Title VII claim.